EXHIBIT "F"

```
 1                    UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
 2                        ORLANDO DIVISION


 3


 4
      RYAN MCLAUGHLIN,
 5
          Plaintiff,
 6
      vs.                                   Case No.:
 7                                          6:12-CV-502-ORL-22
      THE FIRST LIBERTY INSURANCE
 8    CORPORATION,

 9        Defendant.


10


11


12                 DEPOSITION OF RUBEN SOSA, P.E.

13              Taken on Behalf of the Plaintiff


14


15        DATE TAKEN:        Wednesday, August 28, 2013

16        TIME:              11:50 a.m. - 12:15 p.m.

17        PLACE:             SDII Global Corporation
                             4509 George Road
18                           Tampa, Florida

19


20


21


22


23             STENOGRAPHICALLY REPORTED BY:
                    NORA KELLY-MEOLA, RPR
24


25
```

```
 1    APPEARANCES:

 2    Counsel for Plaintiff:

 3        Mark A. Nation, Esquire
          The Nation Law Firm
 4        570 Crown Oak Centre Drive
          Longwood, Florida    32750
 5        (407) 339-1104

 6


 7
      Counsel for Defendant:
 8
          Gerald M. Boza, Esquire
 9        Butler, Pappas, Weihmuller, Katz & Craig, LLP
          777 South Harbour Island Boulevard
10        Suite 500
          Tampa, Florida   33602
11        (813) 281-1900

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I  N  D  E  X

 2   WITNESS:                                    PAGE:

 3   RUBEN SOSA, P.E.

 4   Called by the Plaintiff:

 5      Direct Examination by Mr. Nation            4

 6   STIPULATIONS                                  16

 7   INSTRUCTIONS TO DEPONENT                      17

 8   ERRATA SHEET                                  18

 9   CERTIFICATE OF OATH                           19

10   REPORTER'S DEPOSITION CERTIFICATE             20

11

12

13

14                   E  X  H  I  B  I  T  S

15   No. 31  E-mail dated 4/18/12                   7

16   No. 32  ACI structural journal article        14

17   **Exhibits 1 through 30 previously marked**

18

19

20

21

22

23

24

25
```

1             RUBEN SOSA, P.E., called as a witness

2       by the Plaintiff, having been first duly

3       sworn, testified as follows:

4             THE WITNESS:  I do.

5                       DIRECT EXAMINATION

6   BY MR. NATION:

7       Q.   Sir, my name is Mark Nation.  I represent the

8   plaintiff in this case.  Can you tell us who you are and

9   who you work for.

10      A.   I am Ruben Sosa, Junior.  I work for SDII

11   Global Corporation.

12      Q.   What's your job title?

13      A.   Principal geotechnical engineer.

14      Q.   Was your sole job in this case to come up with

15   a remediation plan?

16      A.   I was requested to provide soil improvement

17   techniques, basically assuming there was a determination

18   that sinkhole activity was affecting the structure.

19      Q.   And a few minutes ago we just finished

20   Dr. Scott's deposition.  He confirmed to me in his

21   deposition that he believed that based on all the

22   reports that are available, that there is sinkhole

23   activity available or -- at the McLaughlin property.

24   And so based on that, do you think your remediation plan

25   is one that takes into account actual sinkhole activity

1    at the property?

2        A.   It was developed without a determination of

3    whether sinkhole activity existed or not.  But a

4    determination now that there is sinkhole activity on

5    site does not lead me to change the recommendations.

6        Q.   Okay.  Was your -- it's okay if I call it a

7    remediation plan?

8        A.   Sure.

9        Q.   Your remediation plan, is that based on SDII's

10   report only or does it take into account Mr. Nettles and

11   Mr. Galotti's report?

12       A.   Those were not available to me at the time I

13   developed it, so it was based on the borings that were

14   done on site and then our local experience in the area

15   because the borings that were done were only to 30 feet.

16       Q.   And I don't know that we can get more local

17   than the McLaughlin's next door neighbor's house, there

18   were borings SDII did there finding sinkhole activity.

19       A.   Uh-hum.

20       Q.   Have you reviewed this report from the

21   neighbor's house?

22       A.   Not recently.  When I developed my soil

23   improvement protocol, I may have looked at data related

24   to this project, but I don't recall specifically.

25       Q.   Do you remember how many sinkholes in the

1   neighborhood that SDII has confirmed?

2       A.   I don't know.

3       Q.   Did you look at more than this report on the

4   Fenn property in coming up with your remediation plan?

5       A.   Again, I don't remember which specific project

6   I looked at.  There was data within 600 feet of the

7   subject property and I looked at those borings primarily

8   to see where we encountered the limestone.

9       Q.   And so regardless of how many you looked at,

10  you looked at some number of reports from the

11  neighborhood to determine how deep the limestone was in

12  that area?

13      A.   Yeah.  I looked at the nearest project.  I

14  didn't look at all of them.

15      Q.   The nearest one.

16      A.   I believe the site in my letter, I said it was

17  within 600 feet of the McLaughlin's property.

18      Q.   Have you seen that document before?

19      A.   No.

20      Q.   Okay.  This is something that Mr. Galotti has

21  prepared showing confirmed sinkholes in the neighborhood

22  from the next door neighbor all the way out to 600 feet?

23      A.   Confirmed by whom?

24      Q.   SDII, Madrid and some other companies on behalf

25  of insurance companies and they're filed actually with

1    Seminole County as confirmed sinkholes.

2        A.    Okay.

3        Q.    Did you look at the county records to determine

4    whether or not there were other sinkholes in the area or

5    just -- you just looked at in-house data?

6        A.    Just in-house data.  I was primarily looking

7    for only the depth of limestone.

8        Q.    And you found that?

9        A.    Yes.

10       Q.    Have you reviewed Mr. Galotti's remediation

11   plan?

12       A.    Subsequent to that, yes.

13       Q.    Okay.  We'll get into that in a second.  So a

14   little background, I'm going to show you Exhibit 1

15   through 29 that have been previously marked.  Do you

16   agree that's a copy of the SDII file with regard to the

17   McLaughlin property?

18       A.    Yeah.  It appears to be the complete file and

19   my understanding is this is the complete file.

20       Q.    Okay.  Then in Mr. Scott's depo or Dr. Scott's

21   deposition we also marked the neighbor's report as 30

22   and so that we're going to mark these consecutively.

23             (Exhibit No. 31 marked for identification.)

24       Q.    I'm going to show you what I've marked as

25   Plaintiff's 31.  Is that a set of e-mails giving you the

1    assignment to prepare this remediation plan?

2        A.    Yes.

3        Q.    Okay.  Would you agree that your remediation

4    plan that you prepared for the McLaughlin property is

5    very similar to the remediation plan for the Fenn

6    property next door?

7        A.    It has the same elements, yes.

8        Q.    Fairly similar in the amount of grout?

9        A.    Somewhat similar.  On the Fenn property I

10   estimated the limestone was deeper than I estimated at

11   the McLaughlin residence.

12       Q.    Well, you estimated in the Fenn property you

13   actually encountered limestone; correct?

14       A.    Yes.  I'm estimating where the injection points

15   are going to be terminated, which is not necessarily

16   when limestone is encountered.

17       Q.    Is the depth to limestone in the Fenn borings

18   the same depth to limestone that you anticipated in the

19   McLaughlin remediation plan?

20       A.    It's different.

21       Q.    In what way?

22       A.    The McLaughlin cost estimate assumes a 75 feet

23   average.  The Fenn, the assumption is 90, 95-foot

24   average.

25       Q.    And you're -- you are basing your report, which

1  is Exhibit 20; is that right --

2      A.   Yes.

3      Q.   -- on just generally what was in the

4  neighborhood?

5      A.   Generally in the neighborhood, understanding

6  that the injection points are going to terminate as

7  appropriate.  So these are only estimates.  To really

8  know where they're going to terminate, that will become

9  apparent as they're installing each and every point.

10     Q.   Okay.  I will show you Exhibit 21.  Tell us

11  what that is.

12     A.   That's a draft markup of the layout that was

13  used to produce the soil improvement protocol letter

14  that I authored dated April 18, 2012, sorry, Exhibit 20.

15     Q.   Whose markups are these, the handwritten

16  markups?

17     A.   This is my handwriting.

18     Q.   What was your role in coming up with the

19  remediation plan for the McLaughlin property?  What part

20  did you play?  It's my understanding that it was you and

21  Mr. Fisher.

22     A.   Mr. Fisher reviewed the letter.  I created

23  initially at least the soil improvement protocol.  He

24  looks at it from a structural engineering standpoint.

25  Primarily he's looking under the underpinning if there

1    is a need or not a need from a structural standpoint.

2       Q.    In this particular case plan that's outlined in

3    Exhibit 20, there's no mention of underpinning; correct?

4       A.    Aside from our explanation as to why we're not

5    recommending underpinning, there's no underpinning

6    included in the protocol that I developed.

7       Q.    Since preparing the remediation plan, have you

8    reviewed Sonny Galotti's remediation plan?

9       A.    Yes.

10      Q.    In what way do you disagree with it, if at all?

11   Do you need to see it?

12      A.    Yes.  That's not it.  Now, he's provided cement

13   grouting stabilization is what he's calling it and

14   perimeter underpinning.  I've included compaction

15   grouting as an element of the soil improvement.

16      Q.    Up to what depth below surface?

17      A.    I estimated a depth of -- may I have my letter

18   back, please?  I estimated a depth of 75 feet.  He

19   estimated a depth of 105, although I do note he never

20   hit limestone in his borings that he performed.  So he

21   has compaction grout injection, he's estimating a deeper

22   depth, average depth than I estimated.  He's estimating

23   significantly more grout would be required.

24      Q.    Do you know how many cubic yards are you

25   estimating?

1      A.    Based on my estimate it was 275 to 375, but,

2   again, that's using the less depth assumption numbers.

3      Q.    You came up with the pricing for your injection

4   points for a cubic yard of the grout personally?

5      A.    Yes.

6      Q.    Okay.  The pricing that Mr. Galotti came up

7   with, did you have any disagreement with the pricing?

8      A.    His unit pricing?

9      Q.    Yes, sir.

10      A.    I'm not finding his unit costs.

11      Q.    I don't know if it's broken down as a unit cost

12   in there.  You may have just -- when you do the math or

13   you can eyeball it and tell me if it appears to be

14   correct.

15      A.    I have to go back and calculate what cost I

16   used.  Again, it's an estimate.  It's going to really --

17   as I stated in my letter, the only way to know how much

18   it really will cost will be based on a contractor's

19   proposal.

20      Q.    Do you find that your pricing is typically

21   consistent with the contractor's proposal?

22      A.    Very often we're close.

23      Q.    Tell me what you're using for linear cost for

24   linear foot for the grout injection points.

25      A.    The casing is $17 per foot in my estimate.

1     Q.    Is that spelled out or you just know?

2     A.    No.  It's there.

3     Q.    Cubic yard?

4     A.    In the -- for the grout per cubic yard is 170.

5     Q.    Okay.  What other pricing -- do you have a

6     mobilization fee?

7     A.    I don't include a mobilization, although we

8     understand it will be applied.  It varies from -- that's

9     one of the reasons we state that, you know, a real final

10    estimate on what it's going to cost will be required to

11    get a proposal from a contractor.  Then I have the

12    chemical grout, which I estimated.  That also includes a

13    $2,500 mobilization and I believe it's $12 per pound,

14    but I would have to back calculate that.

15    Q.    It's $12 or very close to $12?

16    A.    Very close.

17    Q.    Okay.  Mr. Galotti doesn't have the chemical

18    grouting, he has the underpinning; correct?

19    A.    Yes.

20    Q.    Any other charges other than your casing, your

21    grout?

22    A.    We have an estimate of monitoring

23    certification.

24    Q.    What's the amount for that?

25    A.    $8,175.

1      Q.    Other than the opinions expressed in

2    Exhibit 20, do you have any opinions with regard to this

3    case?

4      A.    That I provided?  No.

5      Q.    So your sole job in this case was to come up

6    with this remediation plan in Exhibit 20?

7      A.    Correct.

8      Q.    You weren't asked to determine whether or not

9    there was sinkhole activity present?

10     A.    I was not.

11     Q.    That would be Dr. Scott's job in this case?

12     A.    If tasked when we did a --

13     Q.    Okay.  Typically.

14     A.    Typically we work collaboratively.  The

15   geologist would be the one who identifies the sinkhole

16   activity.  The geotechnical engineer would look at

17   whether that sinkhole activity is affecting the

18   structure and of course the structural engineer deals

19   with the characterization of the structure itself.

20     Q.    Have you personally in the past determined

21   whether or not sinkhole activity is present or absent or

22   has that always been somebody else's responsibility?

23     A.    We discuss our projects together, but as far as

24   taking responsibility for the sinkhole call, that is

25   typically the principal geologist.

1    Q.   And I don't know if you have an opinion on

2    this, do you agree or disagree with Dr. Scott's

3    conclusions with regard to sinkhole activity at the

4    McLaughlin property?

5    A.   The borings that I've seen by Sandy Nettles and

6    Mr. Galotti do show what looks to be sinkhole activity

7    at depth on site.

8         (Exhibit No. 32 marked for identification.)

9    Q.   Exhibit 32, what is that?

10   A.   It's one of the technical papers that were

11   written as part of my master's degree work.

12   Q.   Let me see that.  Looking at 31, who asked you

13   to prepare the remediation plan?

14   A.   Jason Sites communicated that -- this was

15   actually to Dr. Scott, that they wanted a soil

16   improvement protocol consisting of chemical grout and

17   sinkhole stabilization.

18   Q.   And that was forwarded on to you?

19   A.   Yes.

20   Q.   And that's what you did in Exhibit 20?

21   A.   I took his request and looked at the conditions

22   to see, first of all, if they're appropriate.

23   Compaction grouting, if you're assuming there's sinkhole

24   activity, that's the direct method to address the

25   sinkhole activity.  Chemical grout can be added

```
 1    depending on the subsurface conditions.  If he did ask

 2    for it, you know, I will provide recommendations if I

 3    think it's above and beyond what's required.  But in

 4    this case if this were a home that had been determined

 5    to have sinkhole activity affecting the structure,

 6    looking at the shallow soils I would have recommended

 7    chemical grout.  So his request coincided to what I was

 8    going to recommend anyway.

 9        Q.   And then in this e-mail April 18th, you said

10    your 30-foot borings didn't give you enough data to

11    prepare the plan.

12        A.   My recollection was I talked to him on the

13    telephone and he asked that we use, you know, our local

14    experience to come up with, you know, a cost estimate

15    and that's what I did.

16        Q.   Have you ever been to the property?

17        A.   I have not.

18             MR. NATION:  I don't have anything further.

19    Thank you for your time.

20             MR. BOZA:  I don't have any questions.

21             (Deposition concluded at 12:15 p.m.)

22                               ***

23

24

25
```

```
 1                        STIPULATIONS

 2

 3       IT WAS STIPULATED BETWEEN counsel for the

 4   respective parties, with the consent of the witness,

 5   that reading and signing of the foregoing deposition by

 6   the witness be reserved.

 7

 8           THEREUPON, the deposition of RUBEN SOSA, P.E.,

 9   taken at the instance of the Plaintiff, was concluded at

10   12:15 p.m.

11

12           NOTE:  The original and one copy of the

13   foregoing deposition will be held by Mr. Nation.

14

15

16

17

18

19

20

21

22

23

24

25
```

1       DEPONENT'S ERRATA SHEET AND SIGNATURE INSTRUCTIONS

2

3           The original of the Errata Sheet has been

4    retained by Sclafani Williams Court Reporters.

5

6           When the Errata Sheet has been completed by the

7    deponent and signed, a copy thereof should be delivered

8    to each party of record and the ORIGINAL delivered to

9    Mr. Nation, Counsel for Plaintiff, to whom the original

10   deposition transcript was delivered.

11

12                      INSTRUCTIONS TO DEPONENT

13

14          After reading this volume of your deposition,

15   indicate any corrections or changes to your testimony

16   and the reasons therefor on the Errata Sheet supplied to

17   you and sign it.  DO NOT make marks or notations on the

18   transcript volume itself.

19

20   *** REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE

21   COMPLETED AND SIGNED ERRATA SHEET WHEN RECEIVED.

22

23

24

25

```
 1   ATTACH TO THE DEPOSITION OF RUBEN SOSA, P.E.
     CASE:  McLaughlin vs. First Liberty Insurance
 2   CASE NO.:  6:12-CV-502-ORL-22

 3

 4                     ERRATA SHEET

 5       I, RUBEN SOSA, P.E., have read the foregoing

 6   deposition given by me on Wednesday, August 28, 2013, in

 7   Tampa, Florida, and the following corrections, if any,

 8   should be made in the transcript:

 9   PAGE    LINE      CORRECTION AND REASON THEREFOR

10

11

12

13

14

15

16

17

18       Subject to the above corrections, if any, my

19   testimony reads as given by me in the foregoing

20   deposition.

21       SIGNED at _____ Florida, this

22   _____ day of _____, 20___.

23

24                    _____

25                    RUBEN SOSA, P.E.
```

```
 1                    CERTIFICATE OF REPORTER OATH

 2

 3  STATE OF FLORIDA

 4  COUNTY OF POLK

 5

 6            I, the undersigned authority, hereby certify

 7  that the witness named herein personally appeared before

 8  me and was duly sworn.

 9

10            WITNESS my hand and official seal this 28th day

11  of August 2013.

12

13

14

15

16            _____

17            NORA KELLY-MEOLA, RPR

18            NOTARY PUBLIC - STATE OF FLORIDA

19            MY COMMISSION NO.  DD 932708

20            EXPIRES:  NOVEMBER 27, 2013

21            SCLAFANI WILLIAMS COURT REPORTERS, INC.

22

23

24

25
```

```
 1              REPORTER'S DEPOSITION CERTIFICATE

 2

 3    STATE OF FLORIDA

 4    COUNTY OF POLK

 5

 6        I, Nora Kelly-Meola, Shorthand Reporter and

 7    Notary Public in and for the State of Florida at large,

 8    hereby certify that the witness appeared before me for

 9    the taking of the foregoing deposition, and that I was

10    authorized to and did stenographically and

11    electronically report the deposition, and that the

12    transcript is a true and complete record of my

13    stenographic notes and recordings thereof.

14        I FURTHER CERTIFY that I am neither an attorney,

15    nor counsel for the parties to this cause, nor a

16    relative or employee of any attorney or party connected

17    with this litigation, nor am I financially interested in

18    the outcome of this action.

19        DATED THIS 4th day of September 2013 at Lakeland,

20    Polk County, Florida.

21

22

23    _____
      Nora Kelly-Meola
24    SCLAFANI WILLIAMS COURT REPORTERS, INC.

25
```