# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**RYAN MCLAUGHLIN and LESLIE MCLAUGHLIN,**

        **Plaintiffs,**

**v.**                                    **Case No:  6:12-cv-502-Orl-22GJK**

**FIRST LIBERTY INSURANCE CORPORATION,**

        **Defendant.**

## ORDER

This cause comes before the Court on Plaintiffs Ryan and Leslie McLaughlin's ("Plaintiffs") Motion for Summary Judgment (Doc. No. 30), to which Defendant First Liberty Insurance Corporation ("Defendant") filed an Amended Response in opposition (Doc. No. 34). Pursuant to the Case Management and Scheduling Order, Plaintiffs submitted a Reply (Doc. No. 35). Having carefully considered the parties' briefs and supporting materials, the Court will grant the Motion based on the reasoning contained herein.

### I. BACKGROUND

This case is an action for damages arising out of a homeowner's insurance policy Defendant issued to Plaintiffs. At all material times, Plaintiffs owned the residential property located at 1436 Fairway Oaks Drive, Casselberry, Florida. Defendant insured that property under policy number H36-258-245602-401 4 (the "Policy"), effective from February 8, 2011, until February 8, 2012. (Def.'s Mot. Summ. J., Ex. A (Doc. No. 18-1), at 2.) The Policy provides, *inter alia*, the following insurance coverage:

    **SECTION 1 - PERILS INSURED AGAINST**

The following perils are added:

**Sinkhole Loss**

a. Sinkhole Loss means structural damage to the building, including the foundation, caused by sinkhole activity. Contents coverage shall apply only if there is structural damage to the building caused by sinkhole activity.

   **(1)** We will pay to stabilize the land and building and repair the foundation in accordance with the recommendations of a professional engineer and in consultation with you.

b. Sinkhole Activity means settlement or systematic weakening of the earth supporting such property only when such settlement or systematic weakening results from movement or raveling of soils, sediments, or rock materials into subterranean voids created by the effect of water on a limestone or similar rock formation.

The SECTION I - Earth Movement exclusion does not apply to this peril.

(*Id.* at p. 38.)

The key dispute in this case is over the definition of "structural damage." Previously, this Court denied Defendant's Motion for Summary Judgment on its Counterclaim for Declaratory Judgment on one facet of that issue. (*See* Doc. No. 22.) Defendant sought to define "structural damage" via a technical amendment that was enacted in May, 2011 (the "2011 Amendment") to Florida's sinkhole insurance statute – several months after the Policy went into effect. (*See* 2011 Fla. Sess. Law Serv. Ch. 2011-39, § 22.) The Court could not define "structural damage" via the 2011 Amendment, which was so voluminous and technical that it had to be a substantive change in the law, because there was no evidence that the legislature intended the 2011 Amendment to apply retroactively. Although the Court's April 15 Order held that the 2011 Amendment does not supply the definition of "structural damage" in Plaintiffs' policy, that Order did not attempt to ascertain the actual definition of the disputed term.

In November, 2011, Plaintiffs noticed damage to their home, including cracks in the building's exterior, walls, ceiling, floors, and slab, which they believed was consistent with sinkhole activity. (Pls.' Mot. Summ. J. (Doc. No. 30) at 9.) Plaintiffs notified Defendant of their loss in late November, 2011, while the Policy was still in effect. Defendant sent an engineering consultant, SDII Global Corporation ("SDII"), to perform a structural damage evaluation of Plaintiffs' home. SDII "concluded that the McLaughlin home [was] not structurally damaged as defined by" the 2011 Amendment and denied the claim via a January 6, 2012 letter. (Pls.' Compl., Ex. A (Doc. No. 2-1).) The letter conveyed Defendant's engineering consultant's determination that the damage to Plaintiffs' home was cosmetic and "has not impaired the ability of the structure to support intended loads." (*Id.*) Plaintiffs contend that Defendant retained SDII merely to perform a "structural damage" evaluation, not to "determine the presence or absence of sinkhole loss or other cause of damage." (Pls.' Mot. Summ. J. at 9. (quoting Fla. Stat. § 627.7072).)

Plaintiffs retained an expert geotechnical / structural engineer to evaluate the scientific data collected by Defendant's engineering consultant. Plaintiffs' expert testified in an affidavit that (1) sinkhole activity is present at the home site; (2) there is damage to the home; and (3) "within a reasonable degree of professional engineering probability," sinkhole activity was the "primary cause" of that damage as well as the "ongoing distress" to Plaintiffs' home. (Gulati Aff. (Doc. No. 19-5) at 3.) Plaintiffs also retained a professional geologist to conduct independent sinkhole testing at Plaintiffs' residence. His conclusions matched those of the geotechnical / structural engineer. (*See* Pls.' Mot. Summ J., Ex. D (Doc. No. 30-4).)

If the Court construes "structural damage" to include any "damage to the structure," Defendant has offered to admit that (1) the home exhibits minor physical damage; (2) sinkhole

activity caused that damage; and (3) the total amount Plaintiffs may claim under the policy to repair that damage is $205,600. (Def.'s Resp. (Doc. No. 34) at 16.) Because the Court adopts an effectively similar definition, no other factual issues need be addressed.

## II. LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must satisfy this initial burden by "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273, 1277 (11th Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986)). However, the movant is entitled to summary judgment where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. When it conflicts, the court presumes the nonmoving party's evidence to be true and will draw all reasonable inferences in its favor. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003).

In *Anderson v. Liberty Lobby*, the Supreme Court explained that the standard for summary judgment is "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.

## III. ANALYSIS

**A. Construing Insurance Contracts under Florida Law**

Florida law governs the interpretation of the insurance contract in this case. "Federal courts sitting in diversity apply the forum state's choice-of-law rules." *Boardman Petrol., Inc. v. Federated Mut. Ins. Co.*, 135 F. 3d 750, 752 (11th Cir. 1998) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S. Ct. 1020, 1021–22 (1941)). The doctrine of *lex loci contractus* is well-established in Florida – "the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties in determining an issue of insurance coverage." *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006). There is no dispute that the Policy was executed in Florida.

Florida courts construe insurance contracts according to their plain meaning. *Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 291 (Fla. 2007). "[I]f a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a basic policy provision or an exclusionary provision." *Id.* (quoting *Taurus Holdings, Inc. v. U.S. Fid. and Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005)). The policy is ambiguous if "the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the [other] limiting coverage." *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003) (alteration in original) (quoting *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)). "Ambiguous coverage provisions are construed strictly against the insurer that drafted the policy and liberally in favor of the insured." *Fayad v. Clarendon Nat'l Ins. Co.*, 899 So. 2d 1082, 1086 (Fla. 2005) (citations omitted).

**B. Definition of Structural Damage**

The vast majority of Florida state courts and federal district courts that have interpreted "structural damage" as that term appears in the exact same coverage provision have defined the term as "damage to the structure." *See Ayres v.USAA Cas. Ins. Co.*, No. 8:11-cv-816-T-24TGW,

2012 WL 1094321, at *3 (M.D. Fla. Apr. 12, 2012) (collecting state court decisions); Pls.' Mot. Summ. J. at 12 n.9 (collecting decisions from the Middle District of Florida). These courts have held that where the term is undefined in the policy, the "plain and ordinary meaning" should apply, and "damage to the structure" is the plain meaning of structural damage. *Ayres*, 2012 WL 1094321 at *3. Alternatively, if "damage to the structure" is not the only plausible plain meaning of "structural damage," then the term is ambiguous and should be construed in a manner that favors coverage. *Id.*

The Middle District was unanimous in its interpretation of "structural damage" until recently, when Judge Merryday issued two orders rejecting "damage to the structure" and choosing a narrower definition. On September 3 of this year, Judge Merryday entered an order defining "structural damage to the building" as "damage to a part, material, or assembly of the building that affects the stability of the building or that supports a dead or designed live load, and the removal of which part, material, or assembly could be expected to cause a portion of the building to collapse or fail." *Gonzalez v. Liberty Mut. Fire Ins. Co.*, No. 8:12-cv-2549-T-23EAJ, Doc. No. 39, slip op. at 22–23 (M.D. Fla. Sept. 3, 2013). Approximately two months later, Judge Merryday vacated that order *sua sponte*, *Gonzalez*, Doc. No. 41 (M.D. Fla. Oct. 28, 2013), and issued an amended order defining "structural damage to the building" as "damage that impairs the structural integrity of the building." *Gonzalez*, Doc. No. 43, slip op. at 23 (M.D. Fla. Oct. 31, 2013). Neither the vacating order nor the amended order stated the basis for changing the definition of "structural damage to the building," but the amended order specifically noted that the court was not determining the applicability of the 2011 Amendment to the definition of "structural damage." *Id.* at 23–24.

By finding that the 2011 Amendment was not retroactively applicable, this Court effectively ruled out the more detailed definition of "structural damage" from the first *Gonzalez* order. Judge Merryday's second interpretation – "damage that impairs the structural integrity of the building" – is a plausible definition that is not intricately tied to the 2011 Amendment. Judge Merryday relies on textual analysis,[1] definitions of "structural damage" arising in varying contexts from a number of other states' courts, and some legislative history from the 2005 amendment to the statute as well as the 2011 Amendment.

"Structural" is undefined in the Policy, and there is no other indication therein that the term invokes load-bearing walls, trusses, or any other construction component related to ensuring the continued "integrity" of the building. Limiting the definition appears to be inconsistent with the principles of insurance contract interpretation discussed in Part III A. of this Order. Additionally, the second *Gonzalez* definition adds terms that are not defined in the policy and that may be difficult to apply on a consistent basis. Leaving the original disputed term – "structural" – undefined, and adding two new terms to the Policy – "impairs" and "integrity" – seems to undermine what could otherwise be a reasonable definition. The undersigned respectfully declines to follow that approach.

Defining the term "structural" according to its plain meaning, yet in the context of the Policy, supports a clear, broad interpretation. "Structural" is an adjective meaning "of or relating to the physical makeup" of something. *Webster's Ninth New Collegiate Dictionary* (1991). Thus,

---

[1] Judge Merryday's textual argument pointedly notes that defining "structural damage" as "damage to the structure" forces the court to choose from two imperfect options: (1) keep the surrounding clause otherwise intact, producing the awkward phrase "damage to the structure to the building"; or (2) replace the entire clause with "damage to the structure" (under the problematic assumption that "structure" and "building" are perfect synonyms), thereby eliminating the adjective "structural" from the coverage provision.

the most reasonable definition of "structural damage to the building" in the context of the Policy is "damage of or relating to the physical makeup of the building." This can sensibly be reduced to "physical damage to the building," which is the definition the Court adopts. This interpretation is better suited to the Policy than "damage to the structure" for two reasons. First, it avoids the awkward syntax of "damage to the structure to the building" or the undesirable removal of the word "structural" (without a substitute) from the Policy. Second, it ensures that the sinkhole must cause physical damage to the building, not merely intangible damage such as decreased economic value due to the presence of a sinkhole, before "sinkhole loss" occurs. This is consistent with the rest of the Policy, which provides for physical repairs such as stabilizing the land beneath the building and repairing its foundation.

Applying this definition to the undisputed facts of the case, Plaintiffs have clearly met their burden for summary judgment. The testimony of their experts, coupled with Defendant's admissions, compels the Court to find as a matter of law that a sinkhole caused structural damage to Plaintiffs' home.

### IV. CONCLUSION

Based on the foregoing, it is ordered as follows:

1.  Plaintiffs Ryan and Leslie McLaughlin's Motion for Summary Judgment (Doc. No. 30), filed October 2, 2013, is **GRANTED**.

2.  The Court finds as a matter of law that:

    a. "Structural damage to the building" under Policy Number H36-258-245602-401 4 means "physical damage to the building."

    b. Sinkhole activity caused structural damage to Plaintiffs' home, resulting in sinkhole loss.

        c. Under the Policy, Plaintiffs are entitled to a maximum amount of $205,600 in insurance proceeds for costs to repair their home and remediate subsurface conditions.

3. On or before Tuesday, December 17, 2013, the parties are directed to raise, in a joint filing, any remaining issues requiring a decision by this Court, after conferring to determine whether any such issues exist. If necessary, the Court will establish a briefing schedule at that time.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on December 3, 2013.

_____
ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties